UNITED STATES of America, Plaintiff

v.

Crystal Aurora VELA, Defendant.

Criminal No. SA–05–CR–275–OG.

United States District Court,
W.D. Texas,
San Antonio Division.

Oct. 25, 2005.

Thomas Joseph McHugh, U.S. Attorneys, Assistant United States Attorney, San Antonio, TX, for Plaintiff.

Robert L. Shaffer, Law Offices of Robert L. Shaffer, San Antonio, TX, for Defendant.

## ORDER

ORLANDO L. GARCIA, District Judge.

Pending before the Court is Defendant's Motion to Suppress (Dkt.# 14). The Government has filed a response thereto (Dkt.# 21). A hearing was held, and the Court heard testimony relating to the issues raised in the motion. After due consideration, the Court finds that Defendant's motion should be denied for the following reasons.

### I.

#### *Facts*[1]

On April 25, 2005 at about 9:30 p.m., Defendant and four passengers who were illegal aliens were traveling northbound on IH–35 between Laredo and San Antonio in a 1994 White Infiniti. Border patrol agent Izaguirre was conducting roving patrol duties that night, and his vehicle was positioned at mile marker 74 on North IH 35 with its lights shining toward the interstate. As Defendant's vehicle passed him, Agent Izaguirre observed a driver, a passenger in front, and a passenger in back. He drew no conclusions at that time, but

---

1. The Court has relied on the testimony of Agent Izaguirre and the facts contained in the investigative report. Defense counsel confirmed at the hearing that the facts in this case are generally undisputed, and the issues in dispute are legal, rather than factual.

pulled out and "randomly" followed the vehicle as it proceeded northbound. As he followed the vehicle, Agent Izaguirre could not see clearly inside the car, so he used night vision goggles. He observed the driver and a front seat passenger, but not the back seat passenger that he had noticed earlier. He did, however, observe a "bulge" in the back seat, which is an indication that the passenger is attempting to hide. He also observed that the driver and front seat passenger refused to acknowledge his presence, which is a sign of nervousness. For these reasons, and based on his knowledge that alien smuggling during the night on North IH 35 is commonplace, the agent stopped Defendant's vehicle at mile marker 84.

When the vehicle stopped, the front seat passenger opened his door and attempted to flee. The agent apprehended him, and asked why he was trying to flee. The passenger stated that he was an undocumented alien and was in the United States illegally. The agent then found three more Mexican citizens in the back seat, and Defendant in the driver's seat. They were all taken into custody, and Defendant was advised of her Miranda rights. She confessed to transporting illegal aliens, and the aliens gave statements confirming her role in the smuggling scheme. Defendant has been indicted on two counts of transporting illegal aliens for profit.

In her motion, Defendant contends that Agent Izaguirre's observations with the night vision goggles constituted an impermissible "search" in violation of the Fourth Amendment. Alternatively, she claims that the observations, if permissible, were not enough to establish reasonable suspicion and justify an investigatory stop.

## II.

### Legal analysis

The first issue is whether the agent's observations with night vision goggles constituted a search under the Fourth Amendment. Defendant cites *Kyllo v. United States*, 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) in support of her argument. The Government contends *Kyllo* is not applicable.

In the *Kyllo* case, law enforcement officials used a thermal imaging device to detect the presence of warm objects behind walls. Specifically, they used it to scan the defendant's home to detect high intensity lights used in an indoor marijuana growing operation. The Court held that when the Government uses a device that is not in general public use to explore details of the interior of a home that would have previously been unknown without physical intrusion, the surveillance is a search and is presumptively unreasonable without a warrant. *Kyllo*, 121 S.Ct. at 2038. In its analysis, the Supreme Court noted that in the past "we have held that visual observation is no search at all." *Id.* at 2042. However, the growing power of technology has forced the courts to consider whether technology has shrunk the "realm of guaranteed privacy" to the point where certain limits must be imposed. *Kyllo*, 121 S.Ct. at 2043. After considering the facts presented in *Kyllo*, the Supreme Court did impose some limits, but the question herein is whether such limits should apply under the facts in this case.

In making this determination, the Court finds two important distinguishing factors. First, the Supreme Court in *Kyllo* was very concerned with the sanctity of one's home and the expectation of privacy therein. In this case, Defendant was driving down a heavily traveled interstate freeway in a vehicle open to public view. There is a clear distinction between the expectation of privacy behind the walls of one's home and the expectation of privacy behind the windows of a vehicle. *Compare Kyllo*, 121

S.Ct. at 2045 ("In the home, our cases show, all details are intimate details, because the entire area is held safe from prying government eyes") *with Cardwell v. Lewis*, 417 U.S. 583, 590, 94 S.Ct. 2464, 2469, 41 L.Ed.2d 325 (1974)("A car has little capacity for escaping public scrutiny ... [i]t travels public thoroughfares where both its occupants and its contents are in plain view").[2]

The second important distinction in this case is the type of technology that was used to observe Defendant and her passengers. In *Kyllo*, the Supreme Court was persuaded by the fact that the thermal imaging device, which was not in "general public use," penetrated walls to detect something that would otherwise be invisible, and it provided information regarding the interior of the home that could not otherwise have been obtained without "physical intrusion into a constitutionally protected area." *Kyllo*, 121 S.Ct. at 2041, 2042. The night vision goggles used in this case are not infrared or heat-sensing; instead, they merely amplify light. The goggles are commonly used by the military, police and border patrol, and they are available to the public via internet. More economical night vision goggles are available at sporting goods stores. Therefore, night vision goggles which merely amplify light are available for general public use.

District courts addressing the use of night vision goggles since *Kyllo* have determined that there are significant technological differences between the thermal imaging device used in *Kyllo* and night vision goggles such as those used herein. *See e.g., United States v. Dellas*, 355 F.Supp.2d

1095, 1107 (N.D.Ca.2005) (citing *Baldi v. Amadon*, 2004 WL 725618 at *3 (D.N.H. 2004) and *People v. Katz*, 2001 WL 1012114 at *2 n. 4 (Mich.App.2001)(per curiam), *appeal denied*, 465 Mich. 961, 640 N.W.2d 877 (2002)). Night vision goggles do not penetrate walls, detect something that would otherwise be invisible, or provide information that would otherwise require physical intrusion. The goggles merely amplify ambient light to see something that is already exposed to public view. This type of technology is no more "intrusive" than binoculars or flashlights, and federal courts have routinely approved the use of binoculars and flashlights by law enforcement officials. *United States v. Dunn*, 480 U.S. 294, 107 S.Ct. 1134, 1141, 94 L.Ed.2d 326 (1987)(officers standing in open field used flashlight to look inside barn); *United States v. Landry*, 903 F.2d 334, 336 (5th Cir.1990)(used flashlight to look into cab of pickup truck): *United States v. Arredondo Hernandez*, 574 F.2d 1312, 1315 (5th Cir.1978)(used flashlight to view inside of vehicle); *United States v. Grimes*, 426 F.2d 706, 708 (5th Cir. 1970)(used binoculars from 50 yards away to watch defendant load boxes into car); *Hodges v. United States*, 243 F.2d 281, 282 (5th Cir.1957)(used binoculars when conducting surveillance of chicken house from pasture).

■ For these reasons, the Court finds that *Kyllo* is clearly distinguishable, and the use of night vision goggles by Agent Izaguirre on April 25, 2005 to observe the inside of Defendant's vehicle did not constitute a "search" in violation of the Fourth Amendment.

---

**2.** At the hearing, defense counsel alluded to a "greater" expectation of privacy when traveling in the dark; however, there is no legal support for such an argument. *United States v. Ward*, 546 F.Supp. 300, 310 (W.D.Ark.

1982), *aff'd in part, rev'd in part on other grounds*, 703 F.2d 1058 (8th Cir.1983)("Darkness per se has never been regarded as an impenetrable barrier which, alone, demonstrates a legitimate zone of privacy").

■ The final issue is whether Agent Izaguirre was presented with sufficient facts to warrant a reasonable suspicion that the persons in the vehicle were engaging in criminal activity and to justify an investigatory stop. It is well settled that border patrol agents on roving patrol may stop vehicles if they are aware of specific articulable facts, together with rational inferences therefrom, that reasonably warrant suspicion that the vehicle contains illegal aliens. *United States v. Brignoni-Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607 (1975); *United States v. Nichols*, 142 F.3d 857, 865 (5th Cir.). *cert. denied*, 525 U.S. 1056, 119 S.Ct. 621, 142 L.Ed.2d 560 (1998); *United States v. Hays*, 2005 WL 613654 (W.D.Tex.2005). In making a determination of reasonable suspicion, the Court considers the totality of the circumstances, and is guided by several factors, including: (1) known characteristics of the particular area; (2) previous experience of the agent; (3) proximity of the area to the border (4) usual traffic patterns of that road; (5) information about recent illegal alien or drug trafficking in the area; (6) the behavior of the vehicle's driver; (7) the appearance of the vehicle; and (8) the number, appearance and behavior of the passengers. *Brignoni-Ponce*, 95 S.Ct. at 2582; *Nichols*, 142 F.3d at 865; *Hays*, 2005 WL 613654 at *4. No single factor is determinative. *U.S. v. Morales*, 191 F.3d 602, 604 (5th Cir.1999), *cert. denied*, 528 U.S. 1177, 120 S.Ct. 1211, 145 L.Ed.2d 1113 (2000)(quoting *United States v. Moreno-Chaparro*, 180 F.3d 629, 631–32 (5th Cir.1998)).

At the hearing, Agent Izaguirre testified that he patrols the 37–100 mile marker area of I–35 North between Laredo and San Antonio. He stated there is a total of 159 miles between Laredo and San Antonio, and he has made about 65 stops in the area. The farthest distance from the border that he has stopped a vehicle during roving patrol was at the 98 mile marker. The vehicle Defendant was driving was stopped at the 84 mile marker, which is about half way between Laredo and San Antonio. Agent Izaguirre stated that, based on his experience, illegal aliens often walk in a group until they get to Encinal, and then get transportation and travel up IH–35 to San Antonio.

During oral argument, defense counsel correctly noted that the vehicle was not in "close proximity" to the border, which is an important factor. The Fifth Circuit has held that a car traveling more than fifty miles from the border is usually viewed as being too far from the border to support an inference that its journey began there. *See United States v. Orozco*, 191 F.3d 578, 581 (5th Cir.1999). *cert. denied*, 528 U.S. 1144, 120 S.Ct. 996, 145 L.Ed.2d 943 (2000)(quoting *United States v. Jones*, 149 F.3d 364, 368 (5th Cir.1998)); *see also Morales*, 191 F.3d at 605. Therefore, the Court cannot rely on this factor in its analysis of reasonable suspicion, and must carefully review the facts under the remaining factors. *Orozco*, 191 F.3d at 581; *United States v. Henke*, 775 F.2d 641, 645 (5th Cir.1985).

■ Defendant does not dispute the evidence relating to the other factors, and the Court has carefully reviewed each of them, based on the facts herein. Agent Izaguirre testified that he had been a border patrol agent for two years, and his principle duty was to detect and stop vehicles that were transporting illegal aliens. Agent Izaguirre testified, and noted in his investigative report, that IH–35 is a well-known and heavily used route for alien smuggling, and that he has personally handled a significant number of stops in that area. He was very familiar with the route and the manner in which aliens were smuggled on that route. On the night in

question, Agent Izaguirre observed a back seat passenger when the vehicle passed his stationary location. When following the vehicle, he could no longer see anyone in the back seat, but he did observe a "bulge" of some sort, which is indicative of an undocumented alien attempting to conceal himself.[3] He also observed that neither the driver nor front seat passenger were acknowledging his presence, and they appeared to be nervous. Agent Izaguirre also noted that illegal aliens are often smuggled during the night, and it was approximately 9:30 p.m. at the time in question. All of these facts support an affirmative finding of reasonable suspicion under the factors set forth above, and Agent Izaguirre was justified in making an investigatory stop. There has been no violation of the Fourth Amendment.

It is therefore ORDERED that Defendant's Motion to Suppress (Dkt.# 14) is DENIED.

---

**3.** *See United States v. Arredondo–Hernandez,* 574 F.2d 1312, 1314 (5th Cir.1978)(with the aid of a flashlight, the agent noticed a "structural discrepancy" inside the truck's camper).