[No. A125373. First Dist., Div. Four. Dec. 14, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD LIENG, Defendant and Appellant.

[No. A125374. First Dist., Div. Four. Dec. 14, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
TONY LIENG, Defendant and Appellant.

**COUNSEL**

Michael O'Flannigan for Defendant and Appellant Richard Lieng.

Gordon S. Brownell for Defendant and Appellant Tony Lieng.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Seth K. Schalit, Martin S. Kaye and Lisa Ashley Ott, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

RUVOLO, P. J.—

## I.

## INTRODUCTION

In these consolidated criminal appeals, appellant Richard Lieng appeals from his plea of no contest to one felony count of cultivation of marijuana (Health & Saf. Code, § 11358), and appellant Tony Lieng from his plea of no contest to one felony count of possession of marijuana for sale (Health & Saf. Code, § 11359). The issues raised by both appellants on appeal relate to alleged error by the trial court in denying their motions brought under Penal Code section 1538.5 (Section 1538.5), to suppress evidence seized during the execution of a search warrant at real property located in Willits, California, and to traverse/quash the warrant.

We conclude that the trial court did not err in denying appellants' motions, and affirm the judgment and convictions.

## II.

## PROCEDURAL HISTORY

A criminal complaint was filed on April 18, 2008, by the Mendocino County District Attorney charging both appellants with one felony count of cultivation of marijuana (Health & Saf. Code, § 11358) and one felony count of possession of marijuana for sale (Health & Saf. Code, § 11359). Both appellants were held to answer the charges following a preliminary hearing on May 30, 2008. Subsequently, a felony information was filed repeating the charges in the complaint, and appellants entered pleas of not guilty.

Thereafter, appellants filed motions to quash/traverse the search warrants and to suppress evidence under Section 1538.5, claiming evidence was seized during an unreasonable and constitutionally illegal search of their property located at 3550 Chinquapin Drive, Willits, California (the Lieng property). A hearing on the motion was held on January 7, 2009, at the conclusion of which the motion was denied by the trial court.

Prior to trial, both appellants entered into negotiated pleas. Appellant Richard Lieng pled no contest to one felony count of cultivation of marijuana (Health & Saf. Code, § 11358), and appellant Tony Lieng pled no contest to

one felony count of possession of marijuana for sale (Health & Saf. Code, § 11359). At sentencing, the trial court placed both appellants on three years' formal probation, with conditions, including that they each serve 60 days in county jail.

These appeals were thereafter filed, and this court ordered them consolidated for hearing and disposition on March 18, 2010. (Order, Mar. 18, 2010, Ruvolo, P. J.)

## III.

## ANALYSIS

### A. *Standard of Review*

In reviewing the ruling on a motion to suppress, the appellate court defers to the trial court's factual findings, express or implied, when supported by substantial evidence. (*People v. Hoyos* (2007) 41 Cal.4th 872, 891 [63 Cal.Rptr.3d 1, 162 P.3d 528]; *People v. Ayala* (2000) 23 Cal.4th 225, 255 [96 Cal.Rptr.2d 682, 1 P.3d 3]; *People v. James* (1977) 19 Cal.3d 99, 107 [137 Cal.Rptr. 447, 561 P.2d 1135].) The power to judge credibility, weigh evidence and draw factual inferences is vested in the trial court. (*People v. James, supra*, at p. 107.) However, in determining whether, on the facts found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. (*People v. Hoyos, supra*, at p. 891; *People v. Ramos* (2004) 34 Cal.4th 494, 505 [21 Cal.Rptr.3d 575, 101 P.3d 478].)

### B. *Hearing and Ruling on Appellants' Section 1538.5 Motion*

The hearing below on appellants' motion was bifurcated. It was agreed that first the parties would present evidence and argue whether the investigating law enforcement officer's observations at appellants' property, which led to the issuance of the search warrant, violated their Fourth Amendment rights. If the court were to conclude that their rights were not violated, then the parties intended to conduct a followup hearing under *Franks v. Delaware* (1978) 438 U.S. 154 [57 L.Ed.2d 667, 98 S.Ct. 2674], to determine if there was sufficient evidence presented to the magistrate justifying issuance of the warrant, and if there were any material misrepresentations of fact presented to the magistrate by the applicant (*Franks* motion).

### 1. *Testimony of Sergeant Bruce Smith*

The only witness called at the hearing was Mendocino County Sheriff's Sergeant Bruce Smith, who made the initial observations at appellants'

property and who submitted the application for the warrant to the magistrate. Smith testified that he first went to the Chinquapin Drive address on March 27, 2008,[1] about 4:30 a.m. He approached the property via a driveway that led past a metal building and on towards the residence. There was no gate obstructing access to the driveway. The metal building was approximately 20 feet from the driveway.

As Smith walked up the driveway approaching the metal building, he heard electric devices such as fans operating inside the building. He could also smell fresh marijuana in the air. He continued up the driveway towards the residence, which had a garage attached to it. In addition to hearing the fans, as he approached the residence, he saw lights coming from the garage, and he could smell the strong odor of growing marijuana. The noises he heard from both buildings were consistent with what he had heard emanating from other marijuana growing operations.

All of Smith's observations were made from the driveway. At no time did he leave the driveway and walk around the property. The driveway was paved at some point, and then it became a dirt road. Moreover, the driveway was not a "public roadway," but instead was "a common driveway to numerous places." The Lieng property was the last one along the driveway.

From where Smith stopped his car on the driveway, it took 10 to 15 minutes to walk to the residence. It was dark the entire time he was there. While he did not use a flashlight, Smith wore "night vision" goggles during both this visit and a subsequent visit on April 3. The goggles enhanced the available light by magnifying it, allowing him to see better in the dark.

A photograph (Exhibit E) was shown to Smith depicting a road sign stating "Private Road No Trespassing Keep Out."[2] If that sign was on the driveway near or at the Lieng property, Smith did not see it. As he walked up the driveway, he passed at least three other residences, and probably more. He may have seen the sign on the day the search warrant was served. The sign may have been down the road near a grove of trees.

Past the sign there were at least four houses, including the Lieng residence. There was not a gate or fence leading to the entrance to the Lieng property. There was a wire fence that went around at least part of the property and some type of gate at one location, which was open. Smith could not tell how big the gate was, but stated it was open. Smith also believed that it did not

---

[1] All of the subsequent events described herein which led to the issuance of the subject search warrant in this case occurred in the year 2008.

[2] Exhibit E was not admitted into evidence, but the court allowed Sergeant Smith to testify about his own observations.

look like the gate could go all the way across the road if it were to be closed, "but it might've." He knew while he was walking on the driveway that it was the private property of someone, not necessarily that of the Liengs.

Smith returned to the property again on April 3. This visit occurred about 12:30 a.m. As he approached the property, Smith noticed the odor of marijuana earlier than when he visited on March 27, and the odor this time was even stronger. While he believed he probably had a flashlight on his person, Smith did not use it, in order to avoid being seen or detected. Smith "went up to the main residence," to a location on the driveway where a Toyota pickup truck was parked. The truck was parked "right in front of the garage." The vehicle was registered to Tony Lieng.

### 2. *The Warrant Application*

The application for a search warrant was accompanied by the affidavit of Sergeant Smith. In it, he noted that he first received information about the possible cultivation of marijuana at the Lieng property in November 2007, and was provided with a photograph of a Toyota pickup truck parked in front of the residence. A Department of Motor Vehicles search revealed that the truck was registered to appellant Tony Lieng. Smith's visits to the Lieng property formed the basis for the probable cause opinion submitted in his affidavit. The following are the narratives of each visit,[3] as they are material to these issues raised on appeal:

"On 03/27/08 [(Mar. 27, 2008)] at approx. 0430 hrs. [(4:30 a.m.)], your affiant was on duty working in my official capacity as a Sergeant with Mendocino Sheriff's Office [*sic*]. MMCTF Agent Brewster, Agent Hoyle and your affiant walked to the end of Chinquapin Drive, which at this point is a dirt driveway. There is a metal gate which was open and on the post to the left (north) side were the numbers '3550.' We continued on the dirt driveway and as we approached a large metal building/shop we could hear the sound of electrical devices running inside the structure. As we approached closer I could smell the odor of marijuana coming from the large metal building/shop structure. I could see that there were High Intensity Discharge lights (HID lights) on inside the structure as there was light emitting through several small cracks of the structure. The driveway continues past the large shop/building approx. 50 yards to the main residence. We continued to follow the driveway and as we approached the residence we could hear the sound of

---

[3] During the hearing on the motion to suppress, the trial court sustained objections to Smith's testimony concerning a third visit on April 9, because, on that occasion, the sergeant sent others to the property to make observations and he himself did not accompany them. However, the April 9 visit was relevant to the court's later consideration of the motion to traverse the warrant.

electrical devices running inside the garage. The garage is attached to the east side of the residence and nearest to the driveway. I could see that there were HID lights on inside the garage as there was light emitting through several small cracks of the garage. I could smell the odor of marijuana in the area the entire time I approached the large metal building/shop while walking towards the main residence. No vehicles were parked in front of the residence.

"On 04/03/08 [(Apr. 3, 2008)] at approx. 0045 hrs. [(12:45 a.m.)], your affiant was again on duty working in my official capacity as a Sergeant with Mendocino Sheriff's Office [sic]. MMCTF Agent Brewster, Agent Hoyle, S/A Furman and your affiant walked to the end of Chinquapin Drive and up the dirt driveway to 3550 Chinquapin Drive, Willits Ca [sic]. The gate was open and we were able to smell the odor of marijuana in air while at the gate area [sic]. We walked up the dirt driveway and again I could hear the sound of electrical devices running inside the large metal building/shop structure. I could see that there were HID lights on inside the structure as there was light emitting through several small cracks of the structure. We continued past the large shop/building towards the main residence. As we approached the residence we could again hear the sound of electrical devices running inside the garage. I could see that there were HID lights on inside the garage as there was light emitting through several small cracks of the garage. Parked in front of the garage was a Toyota pickup, Cal[ifornia license No.] 7Y20961.

"On 04/09/08 [(Apr. 9, 2008)] S/A Brewster, S/A Furman and Dep. Goss returned to 3550 Chinquapin Drive, Willits Ca [sic]. The three officers walked to the end of Chinquapin Drive and up the dirt driveway. S/A Brewster advised your affiant that the strong smell of marijuana was coming from the large metal building/shop and that HID lights were on inside the structure. S/A Brewster advised that HID lights were on inside the garage and that he could smell the odor of marijuana when he approached the large building/shop and the garage. Parked in front of the garage was a Toyota pickup, Cal[ifornia license number] 7Y20961."

### 3. *The Trial Court's Rulings*

After hearing argument from counsel, the court denied the motion to suppress evidence. The court reviewed the evidence as it related to appellants' contention that the "curtilage" of their home was invaded by Sergeant Smith's entries on March 27 and April 3. While the court was "troubled" by the facts that the observations were made only after Smith had walked a considerable distance along the driveway, and his visits were at night, the court concluded that the case law supported the conclusion that police officers may enter onto a private driveway without violating one's right of reasonable

privacy. In essence, the court concluded that Smith's observations did not violate the "curtilage" rule as it has been developed in search and seizure case law.

As to the *Franks* motion, appellants argued that even accepting the representations presented by Smith in the warrant application to the magistrate, there was insufficient evidence to support a finding of probable cause justifying issuance of the search warrant. Alternatively, counsel argued that the officer was unjustified in stating in the warrant application that the lights he observed emanated from high density lighting associated with growing marijuana.

The court then found probable cause to support the warrant's issuance, and concluded there was no material misrepresentation made by Smith in the application for the warrant.

## C. *Legal Discussion*

■ To prevail on a motion to suppress, a defendant challenging the constitutionality of a search or seizure must have a "legitimate expectation of privacy in the invaded place. [Citations.]" (*Rakas v. Illinois* (1978) 439 U.S. 128, 143 [58 L.Ed.2d 387, 99 S.Ct. 421].) The Fourth Amendment expressly recognizes that individuals have a legitimate expectation of privacy in their own homes. (U.S. Const., 4th Amend.; see also *Kyllo v. United States* (2001) 533 U.S. 27, 31 [150 L.Ed.2d 94, 121 S.Ct. 2038] (*Kyllo*) ["With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no."].)

■ The Supreme Court has also held that persons have a reasonable expectation of privacy in certain exterior areas of residential property. (See *Oliver v. United States* (1984) 466 U.S. 170, 178–180 [80 L.Ed.2d 214, 104 S.Ct. 1735].) But, the zone of Fourth Amendment protection afforded to a person's home does not necessarily extend to his or her property line; only the "curtilage"—i.e., "the land immediately surrounding and associated with the home"—is shielded from unreasonable searches and seizures. (466 U.S. at p. 180 & fn. 11, citing 4 Blackstone's Commentaries 225.) What lies beyond the boundary of the curtilage are "open fields" that government agents may enter without regard to the constraints imposed by the Fourth Amendment. (*Oliver v. United States, supra*, at pp. 179–180.)

■ There is no fixed formula for drawing the line between the curtilage and open fields. Nonetheless, in *United States v. Dunn* (1987) 480 U.S. 294, 301 [94 L.Ed.2d 326, 107 S.Ct. 1134], the Supreme Court identified four factors (the *Dunn* factors) that are relevant to this determination: (1) "the

proximity of the area claimed to be curtilage to the home"; (2) "whether the area is included within an enclosure surrounding the home"; (3) "the nature of the uses to which the area is put"; and (4) "the steps taken by the resident to protect the area from observation by people passing by." The *Dunn* court cautioned that "these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration— whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." (*Ibid.*) "When the prosecution relies on evidence obtained by law enforcement officers from a protected area such as a curtilage without a warrant, it bears 'the burden of establishing either that no search occurred, or that the search undertaken by the officers was justified by some exception to the warrant requirement' such as exigent circumstances." (*People v. Chavez* (2008) 161 Cal.App.4th 1493, 1499 [75 Cal.Rptr.3d 376], quoting *People v. Camacho* (2000) 23 Cal.4th 824, 830 [98 Cal.Rptr.2d 232, 3 P.3d 878].)

## 1. The Dunn *Factors Analyzed on This Record*

In moving to suppress evidence, appellants first argue that the law enforcement officers who conducted the warrantless surveillance at the Lieng property on the nights of March 27 and April 3 intruded upon the curtilage of that property in violation of appellants' Fourth Amendment rights. Accordingly, the court must determine whether the agents' search of the exterior areas of that property was reasonable. In making this determination, the court applies each of the four *Dunn* factors to the facts of the circumstances surrounding the surveillance.[4]

### a. Proximity to the Dwelling

The first *Dunn* factor is the proximity of the area claimed to be curtilage to the dwelling. (*United States v. Dunn, supra*, 480 U.S. at p. 301.) Application of this factor requires a case-by-case inquiry into the nature of the property searched, and is subject to de novo review on appeal. (*U.S. v. Johnson* (2001) 256 F.3d 895, 902, 905.) As the Ninth Circuit noted in *U.S. v. Depew* (9th Cir. 1993) 8 F.3d 1424, 1427, overruled on another point in *U.S. v. Johnson, supra*, at page 913, footnote 4, "[t]here is not . . . any fixed distance at which curtilage ends."

As a general rule, the extent of curtilage on rural properties, such as the subject of the challenged search, will be greater than that in a densely

---

[4] At this hearing, both parties stipulated that appellants had a privacy interest, and thus had standing to challenge the warrant.

populated urban setting. (See *U.S. v. Johnson, supra,* 256 F.3d at p. 902.) For instance, as the Second Circuit has observed, "[o]n a large parcel of land, a pond 300 feet away from a dwelling may be as intimately connected to the residence as is the backyard grill of the bloke next door." (*U.S. v. Reilly* (2d Cir. 1996) 76 F.3d 1271, 1277.) However, even in rural areas, it is rare for curtilage to extend more than 100 feet beyond the home. (See, e.g., *United States v. Dunn, supra,* 480 U.S. at pp. 297, 301–302 [holding that deputies who approached within 90 feet of a rural residence were not within the boundaries of the curtilage]; *U.S. v. Van Damme* (9th Cir. 1995) 48 F.3d 461, 464 [200 feet is outside of the curtilage]; *U.S. v. Brady* (9th Cir. 1993) 993 F.2d 177, 178, overruled on another point in *U.S. v. Johnson, supra,* at p. 913, fn. 4 [45 feet is outside of the curtilage]; *U.S. v. Traynor* (9th Cir. 1993) 990 F.2d 1153, 1158, overruled on another point in *U.S. v. Johnson, supra,* at p. 913, fn. 4 [70 to 75 feet is outside of the curtilage]; *U.S. v. Calabrese* (9th Cir. 1987) 825 F.2d 1342, 1350 [50 feet is outside of the curtilage]; but cf. *U.S. v. Furrow* (9th Cir. 2000) 229 F.3d 805, 817, overruled on another point in *U.S. v. Johnson, supra,* at p. 913, fn. 4 [holding that the district court did not clearly err in finding that a distance of 100 feet is within the curtilage]; *U.S. v. Depew, supra,* 8 F.3d at p. 1427 [distance of 50 to 60 feet, and within five to six feet of his garage, is within the curtilage].)

While the trial court found the question of whether these observations were made from within the curtilage to be a "closer issue," it concluded that they were not made from within the curtilage, and therefore there was no violation of the Fourth Amendment. During both their visits, agents restricted their surveillance solely to observations made from the property's driveway. On March 27, the officers walked on the driveway passing the metal shed, which was about 150 feet from the main residence. On April 3, Sergeant Smith "went up to the main residence," to a location on the driveway near where a Toyota pickup truck was parked. However, there is no evidence as to how far Smith was from the attached garage at his closest point.

Given this evidence, we agree with the trial judge that the evidence supports the conclusion that Sergeant Smith's physical presence on both March 27 and April 3 was not so proximal to the residence as to invade the curtilage of the Lieng property. Therefore, this *Dunn* factor favors the prosecution.

### b. Observations Within the Enclosures Surrounding the Residence

 The second *Dunn* factor requires the court to consider whether the area searched is included within any enclosure surrounding the home. (*United States v. Dunn, supra,* 480 U.S. at p. 301.) As the court observed in *Dunn,* the

boundaries of the curtilage will typically be " 'clearly marked' " and " 'easily understood from our daily experience.' [Citation.]" (*Id.* at p. 302.) The most commonly encountered lines of demarcation are gates and fences, which the court characterized as "important factors in defining the curtilage." (*Id.* at p. 301, fn. 4.) Even in rural areas, where fences may be absent, "natural boundaries such as thick trees or shrubberies may also indicate an area 'to which the activity of home life extends.' . . ." (*U.S. v. Johnson, supra,* 256 F.3d at p. 902, quoting *United States v. Dunn, supra,* 480 U.S. at p. 302.)

Here, the trial court found that the agents went through an "opening in a fence," something the court vaguely describes as "probably a gate." There was no evidence as to whether it was a functioning gate. If so, it was open. Sergeant Smith also testified that there was a "wire fence . . . hooked up to a post that also housed the gate." There was no evidence about the fence's length along the property. Based on these facts, the evidence was insufficient to establish that the area of the driveway was within an enclosure surrounding the residence. Therefore, this factor also weighs against appellants and in respondent's favor.

### c. Uses of Area Searched

■ The third *Dunn* factor is the nature of the uses to which the area searched, or in this case the area from which the police observations were made, was put. (*United States v. Dunn, supra,* 480 U.S. at p. 301.) In applying this factor to the instant motion, the court is mindful that the curtilage analysis is directed toward determining "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." (*Ibid.*)

We have already noted that all of Sergeant Smith's observations were made from that driveway, and at no time did he leave it and walk around the property. While the garage and attached residence were visible, there is no evidence that the officer could see inside the residence from the driveway. Accordingly, the search at issue here did not implicate the interests served by extending Fourth Amendment protections to the driveway, because that location was not so intimately tied to the home that it should be placed under the residence's Fourth Amendment protection. Other cases have held similarly. (See, e.g., *People v. Edelbacher* (1989) 47 Cal.3d 983, 1015 [254 Cal.Rptr. 586, 766 P.2d 1] [an officer's observations from the driveway of a residence did not violate the 4th Amend.]; *U.S. v. Johnson* (D.C. Cir. 1977) 182 U.S. App.D.C. 383 [561 F.2d 832, 835, 853] [observation made from a location a short distance from walkway did not violate the 4th Amend.].)

#### d. Steps Taken to Protect Area from Observation

■ The fourth and final *Dunn* factor requires the court to consider "the steps taken by the resident to protect the area from observation by people passing by. [Citations.]" (*United States v. Dunn, supra,* 480 U.S. at p. 301.) While the language used by the *Dunn* court appears to suggest that the individual objecting to the search must take affirmative steps to shield his or her activities from public view, the Ninth Circuit has on occasion observed that the secluded nature of residential areas on large rural properties weighs in favor of finding that those areas are within the curtilage. (See *U.S. v. Johnson, supra,* 256 F.3d at p. 903; *U.S. v. Depew, supra,* 8 F.3d at p. 1428.)

There is no dispute that the residence on the Lieng property is in a rural area. While this single fact favors a finding that the property searched was within the curtilage, other evidence justified the conclusion that the search was conducted on open fields. (*Oliver v. United States, supra,* 466 U.S. at pp. 179–180.) The trial court was unable to determine whether or not there was a "no trespassing" sign posted during the agents' first two visits. (*U.S. v. Depew, supra,* 8 F.3d at p. 1428 [noting that "posting of 'No Trespassing' signs is significant in terms of constituting an effort to protect the inner areas of a parcel from observation"], citing *United States v. Dunn, supra,* 480 U.S. at p. 301.)

■ The trial court also found that this rural driveway, like others in the area, was accessible to some of the general public, limiting one's expectation of privacy based on the public's ability to access and make observations from the driveway. Those accessing the driveway included appellants' three neighbors, all of whom were able to make the same observations the agents made. No steps were taken by appellants to protect the residence and the metal shed area from observations made from the driveway. Therefore, the fourth *Dunn* factor also favors respondent.

#### e. Summary

An independent *Dunn* analysis leads to the conclusion that all four of the *Dunn* factors favor respondent. Not only does this independent analysis support the lower court's finding, but, as noted, other decisions involving law enforcement observations and surveillance from driveways do as well. (See, e.g., *People v. Edelbacher, supra,* 47 Cal.3d at p. 1015; *U.S. v. Johnson, supra,* 561 F.2d at p. 835.)

Finally, in *U.S. v. Dellas* (N.D.Cal. 2005) 355 F.Supp.2d 1095, 1097, a case with nearly identical facts to those here, the government conducted surveillance of a rural property suspected of being a marijuana growing cooperative, restricting their activities to conducting surveillance from a private dirt

road. The property had a small gate, no fencing surrounding the property and three signs beyond the gate, two mentioning "[p]rivate" driveway and one "Beware of the Dog." (*Ibid.*) The court held that the area searched by agents before they obtained a search warrant fell outside the property's curtilage, and therefore the warrantless search did not violate the defendant's Fourth Amendment rights. (355 F.Supp.2d at p. 1106.)[5]

Therefore, the trial court was correct in finding the area of the Lieng property searched on the nights of March 27 and April 3 falls outside the curtilage of that property, and the court did not err in denying appellants' motion to suppress on that ground.

## 2. *Use of Night Vision Goggles*

Appellants next claim that even if the agents were outside of the curtilage on the nights of March 27 and April 3, their use of night vision goggles to aid their observations violated appellants' Fourth Amendment rights. They argue that the exception to the "open field" rule recognized by the Supreme Court in *Kyllo, supra*, 533 U.S. 27, applies here.

In *Kyllo*, law enforcement officials used a thermal imaging device to detect the presence of warm objects behind walls. (*Kyllo, supra*, 533 U.S. at p. 29.) Specifically, police used the device to scan the defendant's home to detect halide lights used in an indoor marijuana growing operation. (*Id.* at p. 30.) The court held that when the government deploys a device not in general public use in order to explore the details of a home's interior that otherwise would not have been known without physical intrusion, the surveillance is a search and is presumptively unreasonable without a warrant. (*Id.* at p. 34.)

*Kyllo* is inapplicable to this case. First, night goggles are commonly used by the military, police and border patrol, and they are available to the general public via Internet sales. (*U.S. v. Vela* (W.D.Tex. 2005) 486 F.Supp.2d 587, 590.) More economical night vision goggles are available at sporting goods stores. (*Ibid.*) Therefore, unlike thermal imaging devices, night vision goggles are available for general public use.

Second, state and federal courts addressing the use of night vision goggles since *Kyllo* have discussed the significant technological differences between the thermal imaging device used in *Kyllo*, and night vision goggles. (See,

---

[5] The defendant was identified as a "frequent overnight visitor" at the property, one building on which had the accoutrements of a residence. (*U.S. v. Dellas, supra*, 355 F.Supp.2d at pp. 1097–1098, 1102.) While it was questionable whether the building functioned as a "home," the court noted that for purposes of deciding the motion to suppress, it assumed without deciding that the defendant had standing to challenge the search. (*Id.* at p. 1102.)

e.g., *People v. Deutsch* (1996) 44 Cal.App.4th 1224, 1228, fn. 1 [52 Cal.Rptr.2d 366]; *U.S. v. Dellas, supra,* 355 F.Supp.2d at p. 1107; *U.S. v. Vela, supra,* 486 F.Supp.2d at p. 590.) Night vision goggles do not penetrate walls, detect something that would otherwise be invisible, or provide information that would otherwise require physical intrusion. (*U.S. v. Vela, supra,* at p. 590.) The goggles merely amplify ambient light to enable one to see something that is already exposed to public view. (*Ibid.*) This type of technology is no more "intrusive" than binoculars or flashlights, and courts have routinely approved the use of flashlights and binoculars by law enforcement officials. (*Ibid.,* citing *United States v. Dunn, supra,* 480 U.S. at p. 294 [officers standing in open field used flashlight to look inside barn].) (See also *People v. Capps* (1989) 215 Cal.App.3d 1112, 1123 [263 Cal.Rptr. 791], citing *Texas v. Brown* (1983) 460 U.S. 730, 740 [75 L.Ed.2d 502, 103 S.Ct. 1535], overruled on another point in *Horton v. California* (1990) 496 U.S. 128 [110 L.Ed.2d 112, 110 S.Ct. 2301] ["[t]he deputy's use of his flashlight to illuminate the interior of the handbag is of no constitutional significance"]; *U.S. v. Grimes* (5th Cir. 1970) 426 F.2d 706, 708 [investigator used binoculars from 50 yards away to watch defendant load boxes into car]; *Hodges v. U.S.* (5th Cir. 1957) 243 F.2d 281, 282 [agent used binoculars when conducting surveillance of chicken house from pasture].)

For these reasons, we find that *Kyllo* is clearly distinguishable, and the use of night vision goggles by Sergeant Smith on both March 27 and April 3 on the Lieng property did not constitute a "search" in violation of the Fourth Amendment.

### D. Probable Cause for Issuance of the Warrant

Appellants contend that the trial court erred in denying their motion to quash the search warrant for the Lieng property because there was no probable cause, thereby violating their Fourth Amendment rights. They argue that Sergeant Smith's affidavit was a facially insufficient basis for finding probable cause to issue the search warrant due to (1) an illegal warrantless search; and (2) improper reliance on an anonymous informant.

In *Illinois v. Gates* (1983) 462 U.S. 213, 238 [76 L.Ed.2d 527, 103 S.Ct. 2317], the court reaffirmed the "totality-of-the-circumstances" analysis for probable cause determinations by a magistrate. "The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . .

conclud[ing]' that probable cause existed." (*Id.* at pp. 238–239, quoting *Jones v. United States* (1960) 362 U.S. 257, 271 [4 L.Ed.2d 697, 80 S.Ct. 725], overruled on another ground in *United States v. Salvucci* (1980) 448 U.S. 83, 84–85 [65 L.Ed.2d 619, 100 S.Ct. 2547].) "The magistrate's determination of probable cause is entitled to deferential review. [Citations.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1041 [99 Cal.Rptr.2d 1, 5 P.3d 68].)

As discussed above, we have already concluded that the search of the Lieng property was not an illegal warrantless search. Additionally, there was no improper reliance on the anonymous informant. The informant's tip merely provided background information regarding the reason for the surveillance and was not necessary to the finding of probable cause. As such, the trial court properly denied the motion to quash the warrant.

■ Appellants also claim that the trial court erred in denying the motion to traverse based on reckless misstatements and material omissions in the warrant affidavit, both of which undermine the magistrate's finding of probable cause. Suppression of evidence gathered pursuant to a search warrant is required if the magistrate issuing the warrant was misled by statements in the affidavit that the affiant knew to be false or that the affiant made with reckless disregard of the truth. (*United States v. Leon* (1984) 468 U.S. 897, 914 [82 L.Ed.2d 677, 104 S.Ct. 3405], citing *Franks v. Delaware, supra,* 438 U.S. at p. 154.)

The statements at issue here are Sergeant Smith's statements that he saw evidence of the use of high-intensity discharge lights on both his visits to the Lieng property. There is no evidence that Smith made the statements about the lighting at the property knowing them to be false, or that they were made in disregard of the truth. Although it is possible the lights were not actually high-intensity discharge lights, Smith's expertise in marijuana growing operations, as well as the context in which he saw the bright lights shining through cracks in the metal shed and garage, including smelling marijuana and hearings fans from those locations, supported a reasonable belief that they were high-intensity discharge lights. Given those facts, the trial court properly denied appellants' motion to traverse.

## IV.

## DISPOSITION

The judgments are affirmed.

Reardon, J., and Rivera, J., concurred.

Appellants' petitions for review by the Supreme Court were denied April 13, 2011, S189908.