Filed 12/3/14  P. v. Pineda CA4/2

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E059941 |
| v. | (Super.Ct.No. RIF1300655) |
| DAVID OVANDO PINEDA, | **OPINION** |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Jean P. Leonard, Judge.
Affirmed.

Robert V. Vallandigham, Jr., under appointment by the Court of Appeal, for
Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney
General, Julie L. Garland, Senior Assistant Attorney General, A. Natasha Cortina, and
Ryan H. Peeck, Deputy Attorneys General, for Plaintiff and Respondent.

# I

## INTRODUCTION

On January 28, 2013, a complaint charged defendant and appellant David Ovando Pineda with cultivating marijuana under Health and Safety Code section 11358 (count 1); possession of marijuana for sale under Health and Safety Code section 11359 (count 2); and theft of utilities over $950 under Penal Code section 498, subdivision (d) (count 3).

On April 30, 2013, the trial court denied defendant's motion to suppress evidence under Penal Code section 1538.5. Defendant filed a writ of mandamus which we summarily denied.

On May 14, 2013, the People filed an information with the same charges as the complaint. Defendant filed a motion to set aside the information on the same ground as the motion to suppress. The trial court denied the motion. Defendant filed a writ of mandamus which we denied.

On August 26, 2013, defendant pled guilty to all charges. The trial court found that there was a factual basis for the plea. On September 23, 2013, the court sentenced defendant to an aggregate term of two years in prison, as follows: one year and four months (count 1); stayed concurrent term of one year and four months (count 2); and consecutive term of eight months (count 3).

On October 30, 2013, defendant filed a timely notice of appeal, challenging the denial of his motion to suppress. Defendant requested a certificate of probable cause, which the court granted. For the reasons set forth below, we find that the trial court properly denied defendant's motion to suppress.

## II

## STATEMENT OF FACTS[1]

On December 13, 2012, in Perris, California, the Riverside County Sheriff's Department responded to a report that two subjects were breaking into a residence on Akina Avenue. When deputies arrived, there were no suspects at the residence. However, during a security sweep, the deputies discovered a fully operational hydroponics marijuana grow house. Deputy Pentel executed a search warrant for the Akina Avenue home. In a search of the home, Deputy Pentel seized "marijuana plants and other evidence." The deputy also discovered rental receipts for the Akina Avenue house and a house on Bearberry Drive in Moreno Valley. The receipts were attached to each other, and defendant's name appeared on the Bearberry Drive receipt as the payor. Although Deputy Pentel knew that a female named Jeanette lived at the Akina Avenue house, he discovered male clothing in one of the closets. The discovery of the clothes, in addition to the rental receipts, led the deputy to believe that defendant lived at both homes.

Riverside County Sheriff's Department Investigator Joshua Parker is a part of the Special Investigations Bureau Marijuana Eradication Team. He has significant experience investigating narcotics-related crimes, and is familiar with the modes of operation of marijuana growers. He has conducted over 100 investigations involving the

---

**1** Since defendant pled guilty, the statement of facts is derived from the evidentiary hearing on the motion to suppress, the search warrant affidavit, and the probation report.

indoor cultivation of marijuana. Based on his training and experience, he believes that people who are known to operate one grow house will often also operate other grow houses. He is also able to identify marijuana.

After learning about the rent receipts, Investigator Parker twice visited the Bearberry Drive home. He testified that it was "a single-story tract home." The front of the house was unfenced and did not have a "No Trespassing" sign. The driveway of the house was the length of a car, and ran from the garage to the sidewalk. Although there were windows at the top of the garage door, a passerby could not see through the garage windows from the street.

On December 18, 2012, at approximately 8:00 p.m., Investigator Parker approached the house on foot. As soon as he stepped onto the driveway, he heard the sound of air conditioning fans. Investigator Parker continued to walk up the driveway until he was close enough to touch the garage door. Investigator Parker was able to stand on the tips of his toes and see through the windows at the top of the garage door. When he did, he saw that construction was underway on the interior walls within the garage. While standing next to the garage door, he could also smell marijuana. The investigator testified that it was a cold night on December 18, and that there was no need for an air conditioner to be running. He explained that marijuana grow houses frequently run air conditioning regardless of the outside climate because the lights used to grow marijuana generate heat. Investigator Parker also testified that operators of grow houses will often construct interior walls, such as those found in the Bearberry Drive home.

On January 11, 2013, at 5:30 a.m., Investigator Parker returned to the Bearberry Drive home. As he neared the garage, he again heard the sound of air conditioning fans and detected the odor of marijuana.

Investigator Parker explained that he was not attempting to make contact with defendant on either December 18 or January 11. He never knocked on the front door. On both occasions, he was investigating the potential grow house and did not want to alert defendant.

Based on the constant sound of air conditioning fans, the odor of marijuana, and that the rent receipt for the Bearberry Drive house was found in the Akina Avenue grow house, Investigator Parker obtained a search warrant for the Bearberry house.

When the search warrant was executed, defendant was home with his seventeen-year-old son. Investigators found 603 marijuana plants. Three bedrooms had been converted to hydroponic grow rooms, with light hoods, ballasts, air conditioning units, fans, and electric switch timers. Another room had been specially configured to foster the growth of immature marijuana plants. Two other rooms had been designed to care for mature marijuana plants. The garage was used to grow clones, and contained an electric bypass, installed below the electric meter, to allow for theft of electricity. Southern California Edison Revenue Protection Investigator Pat Shepherd estimated theft of $5,400 of electricity.

Defendant, after given his rights under *Miranda*, admitted that the marijuana inside the residence belonged to him and he obtained the installation of the electric

5

bypass to save money on his electric bill. He expected to sell the marijuana for $1,500 per pound.

Defendant was subsequently arrested and charged.

## III

## ANALYSIS

On appeal, defendant contends that the trial court erred in denying his motion to suppress on the ground that Investigator Parker violated his Fourth Amendment rights by searching the grounds of his home without a warrant. We disagree.

A. *The Fourth Amendment*

"The Fourth Amendment provides '[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated . . . .' (U.S. Const., 4th Amend.) This guarantee has been incorporated into the Fourteenth Amendment to the federal Constitution and is applicable to the states. [Citation.] A similar guarantee against unreasonable government searches is set forth in the state Constitution (Cal. Const., art. I, § 13) but, since voter approval of Proposition 8 in June 1982, state and federal claims relating to exclusion of evidence on grounds of unreasonable search and seizure are measured by the same standard. [Citations.] 'Our state Constitution thus forbids the courts to order the exclusion of evidence at trial as a remedy for an unreasonable search and seizure unless that remedy is required by the federal Constitution as interpreted by the United States Supreme Court.'" (*People v. Camacho* (2000) 23 Cal.4th 824, 829-830 (*Camacho*).)

6

"In reviewing the trial court's ruling on the suppression motion, we uphold any factual finding, express or implied, that is supported by substantial evidence, but we independently assess, as a matter of law, whether the challenged search or seizure conforms to constitutional standards of reasonableness." (*People v. Hughes* (2002) 27 Cal.4th 287, 327.)

"The 'ultimate standard set forth in the Fourth Amendment is reasonableness' [citation], and, after *Katz v. United States* (1967) 389 U.S. 347 . . . , we ask two threshold questions. First, did the defendant exhibit a subjective expectation of privacy? Second, is such an expectation objectively reasonable, that is, is the expectation [one that] society is willing to recognize as reasonable?" (*Camacho, supra,* 23 Cal.4th at pp. 830-831.)

B. *The Driveway Is Not Within the Home's Curtilage*

Defendant contends, in a conclusory fashion, that defendant's driveway was within the home's curtilage, and thus, protected by the Fourth Amendment from searches. We disagree.

Curtilage is the area "so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." (*United States v. Dunn* (1987) 480 U.S. 294, 301 (*Dunn*).) In identifying the extent of the curtilage, four factors are considered: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." (*Ibid*.)

7

In this case, as to the first factor, the proximity of the driveway to the home was one car length, and abutted both the garage and the sidewalk. Although the driveway is relatively close to the home, it is the same distance to the sidewalk – a public space. As to the second factor, "whether the area is included within an enclosure surrounding the home" (*Dunn*, *supra*, 480 U.S. at p. 301), we note that the driveway was not included within an enclosure. There was no fence or anything surrounding the home. The third factor, "the nature of the uses to which the area is put," (*Ibid.*), weighs against the driveway being considered curtilage. The driveway was put to its ordinary use. The driveway is the path up to the home, the path which Investigator Parker, and members of the public, walked to gain access to the home. These things are done in the public eye, in full view of neighbors and passersby. Finally, the fourth factor to be considered, "the steps taken by the resident to protect the area from observation by people passing by" (*Ibid.*), also weighs against a finding that the driveway was curtilage. Defendant took no steps whatsoever to protect this area from the observation of people passing by. There was not a "No Trespassing" sign, and there was no fencing. Moreover, there were large windows set into the garage door, exposing the activity inside the garage to those standing on the driveway.

The court of appeal decision in *People v. Lieng* (2010) 190 Cal.App.4th 1213, is instructive. There, the court found that entrance onto a long driveway did not intrude upon the curtilage of the defendant's home. (*Id.* at p. 1227.) In *Lieng*, an officer approached the property in question via a private driveway at 4:30 a.m. (*Id.* at pp. 1218-1220.) There was no gate obstructing access to the driveway, although there may have

8

been a "Private Road No Trespassing Keep Out" sign posted near the entrance of the driveway, which the officer did not see. (*Ibid.*) It took ten to fifteen minutes for the officer to walk down the driveway to the Lieng residence, but at no time did he leave the driveway and walk around the property. (*Ibid.*) Additionally, a wire fence at least partially enclosed the Lieng property, and there was an open gate at one part of the driveway. (*Ibid.*) The officer was using night vision goggles and observed smells and sounds associated with a marijuana growing operation. (*Ibid.*)

Even though the Liengs' driveway went deep into private property, had signage warding off trespassers, and at places was fenced, the court held that the driveway was outside the curtilage of the residence. (*Lieng*, *supra*, 190 Cal.App.4th at pp. 1223-1227.) The court noted that it was important that the officer never left the driveway, any gate the driveway may have had was open, and the defendant had a low expectation of privacy in the driveway because it was accessible to the general public. (*Ibid.*)

Compared to *Lieng*, *supra*, 190 Cal.App.4th 1213, defendant's driveway enjoyed less privacy – there were no signs posted warning of privacy and there were no gates to enclose the driveway. The short driveway was open and adjacent to a public sidewalk and street. The investigator, while on the driveway, noticed the smell of marijuana and heard the sound of the air conditioner – something any person who walked up the driveway could have observed.

In sum, the driveway was not part of the curtilage, and so was not protected by the Fourth Amendment. (See *United States v. McIver* (9th Cir. 1999) 186 F.3d 1119, 1123

9

[driveway in front of the garage of a residence is outside the home's curtilage], cited in *People v. Zichwic* (2001) 94 Cal.App.4th 944, 955-956.)

C. *There Was No Objectively Reasonable Expectation of Privacy in the Driveway*

Assuming arguendo that the driveway was curtilage, defendant's constitutional rights were not violated because there was no objectively reasonable expectation of privacy in the driveway.

The presence of an officer within the curtilage of a residence does not automatically amount to an unconstitutional invasion of privacy. It must be determined under the facts of each case just how private the particular observation point actually is. Police with legitimate business may enter areas of the curtilage that are impliedly open, such as access routes to the house. In doing so, they are free to keep their eyes open. An officer is permitted the same license to intrude as a reasonably respectful citizen. A substantial and unreasonable departure from such an area, or a particularly intrusive method of viewing, however, will exceed the scope of the implied invitation and intrude upon a constitutionally protected expectation of privacy. What is reasonable cannot be determined by a fixed formula. Rather, it must be based on the facts and circumstances of each case. (*People v. Thompson* (1990) 221 Cal.App.3d 923, 943.)

The Fourth Amendment protection of the home never has been extended to require law enforcement officers to shield their eyes when passing by a home on a public street. Nor does the mere fact that an individual has taken measures to restrict some views of his activities preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible. What a person knowingly

10

exposes to the public, even in his own home, is not a subject of Fourth Amendment protection. (*Camacho, supra,* 23 Cal.4th at pp. 829-831.)

In this case, defendant's driveway was exposed to the public. It abutted to the public sidewalk and was the path up to the home. There was no fence around the driveway, there were no walls, and there were no signs. The difference, according to the investigator, between being able to hear sounds of air conditioning and not, was simply one step off the public sidewalk. Defendant also knowingly exposed the occurrences within the garage to the public by virtue of the windows in the garage door. From these facts, it cannot be said that defendant had any subjective expectation of privacy in the sights, sounds, and smells observable from his driveway. (*California v. Ciraolo* (1986) 476 U.S. 207, 215 ["it is unreasonable for respondent to expect that his marijuana plants were constitutionally protected from being observed with the naked eye from an altitude of 1,000 feet"].)

Moreover, even if defendant did have a subjective expectation of privacy, it is not one which society is prepared to recognize as reasonable. Defendant's driveway, like many other suburban driveways, was easily visible and accessible to the public. Any guest – invited or not – would have smelled marijuana or heard the air conditioning fans. A police officer cannot be said to have been "standing upon trespassed property" where any other member of the public would have been impliedly invited or allowed to enter. (*Lorenzana v. Superior Court* (1973) 9 Cal.3d 626, 641.)

Both parties have cited extensively to a recent United States Supreme Court case, *Florida v. Jardines* (2013) __ U.S. __, 133 S.Ct. 1409 (*Jardines*). *Jardines*, however, is

not relevant to this case. In that case, the Supreme Court considered "whether using a drug-sniffing dog on a homeowner's porch to investigate the contents of the home is a 'search' within the meaning of the Fourth Amendment." (*Id.* at p. 1413.) In *Jardines*, two detectives, one of whom was a trained canine handler with a drug-sniffing dog, approached the defendant's home. As the dog approached the defendant's front porch, "he apparently sensed one of the odors he had been trained to detect, and began energetically exploring the area for the strongest point source of that odor." (*Ibid.*) After the dog actively displayed signs of detecting odors associated with drugs, he sat down at the base of the front door, "trained behavior upon discovering the odor's strongest point." (*Ibid.*) Based on this, the detective applied for and received a warrant to search the defendant's residence. After the warrant was executed, the defendant attempted to flee and was arrested. The detectives found marijuana plants. The defendant was charged with trafficking in cannabis. (*Ibid.*)

The *Jardines* court reaffirmed a previous United States Supreme Court holding that "there is no doubt that the officers entered [the home's curtilage]: The front porch is the classic exemplar of an area adjacent to the home and 'to which the activity of home life extends.'" (*Jardines*, *supra*, __ U.S. __, 133 S.Ct. at p. 1415, quoting *Oliver v. United States* (1984) 466 U.S. 170, 182.) Our case is distinguishable. Here, the officer never went to the front porch of defendant's home. The officer smelled the marijuana and heard the air conditioning unit as he stepped onto the driveway.

Thereafter, in *Jardines*, the court analyzed whether the detectives violated the defendant's fourth amendment rights by searching on his front porch. The court

12

acknowledged that the courts "have accordingly recognized that 'the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds.' [Citation.] This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave. Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters. [Footnote omitted.] Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.' [Citation.]" (*Jardines*, *supra*, __ U.S. __, 133 S.Ct. at pp. 1415-1416.) However, the court noted that by "introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no customary invitation to do *that*." (*Id.* at p. 1416.) The court concluded: "The government's use of trained police dogs to investigate the home and its immediate surroundings is a 'search' within the meaning of the Fourth Amendment." (*Id.* at pp. 1417-1418.)

Again, the facts in this case are distinguishable. Here, there was no drug-sniffing dog; Investigator Parker entered the driveway as a licensee and his use of ordinary senses did not exceed the scope of that license. Therefore, we find *Jardines*, *supra*, __ U.S. __, 133 S.Ct. at pp. 1415-1416, to be inapplicable to the case at hand.

In summary, we agree with defendant's appellate counsel that this case "was an easy call that might have been an example from a first year criminal procedure class." However, "[w]ith all due respect to [counsel]," we find, in this "easy" analysis, that the

13

trial court properly denied defendant's motion to suppress. Here, defendant's driveway was exposed to the public. He had no reasonable expectation in the sounds and smells emanating from his home and detectable by human senses from his driveway. Therefore, we find Investigator Parker's actions comported with the requirements of the Fourth Amendment.

## IV

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI
J.

We concur:

HOLLENHORST
Acting P. J.

KING
J.

14