Filed 4/16/25  P. v. Barry CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>EDWARD JOSEPH BARRY,<br><br>      Defendant and Appellant. | B337178<br><br>(Los Angeles County<br>Super. Ct. No. YA105062) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Alan I. Rubin, Commissioner, and Hector M. Guzman, Judge.  Affirmed.

The Noriega Law Firm and Lauren A. Noriega for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, and Deepti Vaadyala, Deputy Attorney General, for Plaintiff and Respondent.

———————————————

Edward Barry appeals from the judgment of conviction entered after he pleaded no contest to possession of a controlled substance with a firearm.  (Health & Saf. Code, § 11370.1, subd. (a).)  Barry contends the preliminary hearing magistrate erred in denying his motion pursuant to Penal Code[1] section 1538.5 to suppress evidence obtained from the warrantless entry and search of his home, and the trial court erred in denying his renewed motion to suppress made in the trial court and motion under section 995 to set aside the information.  Barry argues the law enforcement officers' use of night vision binoculars to surveil his garage, entry onto his driveway to detain him, and forced entry into his home to conduct a protective sweep violated his Fourth Amendment rights.  We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

A.    *Evidence at the Suppression Hearing*

The preliminary hearing and a concurrent hearing on Barry's motion to suppress were held on June 9, 2022 before a magistrate.[2]  Los Angeles County Sheriff's Department (LASD) Detectives Roberto Reyes, Goro Yoshida, and Mario Magdaleno testified.  Each detective was a member of the LASD Narcotics Bureau and the California Multijurisdictional Methamphetamine Enforcement Team (Cal-MMET).  The magistrate admitted photographic evidence of items seized from Barry's property.  Barry did not testify or present any evidence.

---

[1]    Further undesignated statutory references are to the Penal Code.

[2]    Alan I. Rubin, Commissioner.

On October 22, 2020 Detective Reyes was part of a Cal-MMET task force conducting surveillance of a white sedan parked in a shopping center parking lot in Redondo Beach. Detective Reyes testified that after about an hour on the scene, he observed Barry[3] walking alone through the parking lot looking at the cars. Barry was not the target of the investigation, and Detective Reyes did not know who Barry was. Barry walked past the white sedan, looked at the vehicle's rear license plate, and then entered the vehicle without using a key. Barry's behavior was consistent with a "vehicle swap," a narcotics operation Detective Reyes was familiar with from previous investigations, which involves a vehicle "loaded with narcotics" that is driven to a commercial parking lot and left unlocked. "[S]oon after . . . another person will approach, enter that vehicle and take the vehicle away for the purposes of unloading narcotics." Detective Reyes followed the sedan as Barry drove out of the parking lot directly to a single-family residence on Firmona Avenue (the Firmona home), which was less than a mile away (also in Redondo Beach).

After Barry arrived in the sedan at the Firmona home, Detective Yoshida was called out to the home to conduct surveillance. Detective Yoshida testified that he reached the location around 7:00 p.m. It was already dark, and the streetlights were on. He wore plain clothes and parked his vehicle in a parking lot across the street from the Firmona home with a direct line of sight down the home's driveway. Detective Yoshida used "pretty large" binoculars with night vision.

---

[3] Detectives Reyes, Yoshida, and Magdaleno each identified Barry in the courtroom.

Throughout his surveillance he remained in radio contact with other members of the task force and provided them with real-time updates.

From his vantage point, Detective Yoshida observed the white sedan was parked at an angle partially inside a two-car garage at the far end of the driveway. Detective Yoshida had a direct view of the driver's side of the vehicle.[4] He estimated the driveway was about 40 feet long, and the sedan was about 60 feet from his vantage point across the street. There was a door in the back of the garage that Detective Yoshida believed led into the main house; he later learned the door instead led into a fenced backyard with access to the house.

Detective Yoshida could see movement underneath the sedan. He observed a male, later identified as Barry, crouched by the front bumper. At first Detective Yoshida could not tell what Barry was doing, but as Detective Yoshida watched, he was able to see that Barry was dismantling the bumper. Barry then began to remove brick-sized packages from the bumper area and place them in a grocery bag. From his training and experience, Detective Yoshida believed the brick-sized packages were likely to contain narcotics. As Barry was unloading and bagging the packages, a female, later identified as Barry's girlfriend, Gabriela, went back and forth between Barry's location and the direction of the house, where she would disappear from view for

_____

[4]     In his opening brief Barry asserts the garage door was "partially closed." However, the preliminary hearing transcript does not include testimony the garage door was partly closed. Detective Yoshida testified he had an unobstructed view into the garage and could see many items inside, including laundry appliances and shelving.

4

several minutes before returning.[5]  Barry finished loading the grocery bags and carried them in the direction of the house. Detective Yoshida admitted during cross-examination that he could not see if Barry, Gabriela, or the narcotics ever went inside the house, but he believed the narcotics had been carried inside based on his impression of the property layout.

Less than 10 minutes later, Barry returned to the garage when a second male, later identified as Julio Sanchez, arrived in another vehicle and parked in the driveway.  Barry got into the white sedan, and Sanchez got back into the second vehicle, and they both prepared to reverse their vehicles out of the driveway. Detective Yoshida relayed this information to the rest of the task force, and the team decided "to stop the vehicles at the driveway." Officers wearing vests labeled "Sheriff's Department" with the LASD emblem, tactical gear, and gun belts swarmed onto the driveway, blocking Barry and Sanchez from leaving.  The officers loudly announced they were from the LASD.  Several windows of the house faced the location where the officers stopped Barry and Sanchez.

Detective Mario Magdaleno was in charge of the investigation and was one of the six officers who surrounded the two vehicles.[6]  Detective Magdaleno testified the vehicles were

---

[5]     During cross-examination, Detective Yoshida admitted he earlier stated in an email to a deputy district attorney that he saw Gabriela inside the garage only one time, several minutes before Barry began handling the narcotics packages.  However, Detective Yoshida confirmed that he observed Gabriela enter the garage multiple times while Barry was handling the packages.

[6]     In addition to the six officers who detained Barry and Sanchez, four other officers were stationed in "the outer area."

stopped in a position that was "directly in line" with and "no more than 10 feet" from the house. As Barry was being removed from the sedan—before he was asked any questions—he spontaneously stated, "'the stuff's inside'" and "my girlfriend's inside.'"[7] Detective Magdaleno testified he was concerned about the statements, explaining that in any narcotics operation, particularly a large-scale operation, "we're fearful of individuals inside locations who could be arming themselves, or people that we have . . . not been able to detain at that point. And being that we're looking at narcotics we want[] to ensure that there's an officer safety element that we must adhere to, protective sweeps, entering locations, clearing locations just to ensure the safety of the officers as well as the people." Moreover, Detective Magdaleno testified, in his experience with large-scale narcotics operations, once police officers expose themselves to anyone involved in the operation, it is urgent to "freeze [the] location" to ensure that evidence is not destroyed. He testified, "There's an exigency for us to make an attempt to enter the location as readily and as quickly as possible to . . . preserve that evidence."

After Barry and Sanchez were taken out of their respective vehicles, officers checked the vehicles to confirm there were no

---

Altogether, approximately 10 officers and six or seven police vehicles were part of the operation.

[7]    Barry made the statement "'the stuff's inside'" to the officer who removed Barry him from the sedan, and that officer contemporaneously relayed Barry's statement to Detective Magdaleno. Detective Magdaleno personally heard Barry say, "'My girlfriend's inside.'" Detective Magdaleno was designated as the investigating officer for the purpose of the preliminary hearing.

6

other passengers inside.[8]  Officers then walked through the garage area toward the rear door of the garage because it was "the last known area that we had seen the girlfriend walk through."  After the garage area was cleared, officers went through the garage door, which led into the fenced backyard with a cement path leading to the rear entrance to the house.  Detective Magdaleno banged loudly on the wrought-iron door of the house and repeatedly announced, "'Sheriff's Department.  Come to the door please'" in English and Spanish.  In between the announcements and banging, he could hear footsteps and shuffling inside, but no one answered the door or responded to his announcement.  Detective Magdaleno feared someone inside the house was "possibly . . . arming themselves" and "possibly destroying evidence."

After about a minute of banging on the door, Detective Magdaleno directed the other officers to open the outer wrought iron door with a "pick and lock ram."  As officers breached the perimeter of the outer door frame, they heard the voice of a female (Gabriela), who then opened the door for them.  Officers led Gabriela outside and performed a protective sweep inside the house "to ensure nobody else was in there and there was no harm."  During the sweep, officers identified two large grocery bags containing narcotics packages sitting on the floor of the central hallway in "plain view."

After the protective sweep, Detective Magdaleno stationed officers at the house to make sure that no one could enter, but the officers were instructed not to conduct any additional searches.

---

[8]     Barry and Sanchez were handcuffed and escorted to the front of the house and placed in a police car.

While Barry was detained in a police car on the street, Detective Magdaleno obtained a search warrant, which took a "couple of hours." Once the warrant was authorized, officers searched the house and recovered 12 "kilo-type" packages presumed to contain narcotics, a sandwich bag filled with pills, numerous large-capacity magazines in various calibers, part of an AK-47 assault rifle, two shotguns, a small pistol in a metal case, and an assault pistol. During a subsequent search of the sedan, two additional "kilo"-type packages were recovered from a compartment in the front bumper area. Officers found graffiti associated with the Westside Culver City gang, a criminal street gang, including gang monikers, on a table inside the garage.

During cross-examination, Detective Magdaleno admitted it was fair to say his team "created [the] exigency" to enter the Firmona home "by making [themselves] known to the people at the residence" as a result of detaining Barry and Sanchez in the middle of the driveway. But Detective Magdaleno's experience with similar vehicle-swap operations, combined with Barry's movements as relayed by Detective Yoshida, led him to believe the sedan likely contained narcotics even after Barry finished unloading the packages, because Barry was likely taking the car somewhere to be picked up again. Moreover, it was not feasible based on the number of officers and vehicles available to the team to follow and try to arrest Barry after he left the Firmona home, while also securing the scene until the officers could obtain search warrants. Magdaleno explained that attempting to follow Barry with insufficient officers posed a risk: "Often we don't know where these people are going and if they start driving too far and we don't have enough people to follow, the undercover

officer could be made out. . . . We need to have enough and sufficient people to ensure the safety of the team."

After the presentation of evidence, the parties stipulated that the materials recovered from the Firmona home and the white sedan were tested by a laboratory and included more than 6 kilograms of cocaine and 29 grams of methamphetamine tablets. The parties also stipulated the assault pistol was an operable .223-caliber semi-automatic assault weapon.

B.      *Barry's Motions To Suppress and Set Aside the Information*

Barry filed his motion to suppress in advance of the preliminary hearing and noticed it to be heard concurrently. He argued there was no probable cause for his warrantless detention and de facto arrest, and no probable cause or exigent circumstances justifying law enforcement's entry and search of his home and curtilage. Further, Barry asserted that all statements he made to the police officers, even if they were spontaneous, must be suppressed because the officers were not lawfully present on his property. He also argued all evidence subsequently found at the property must be suppressed under the exclusionary rule as the fruit of the unlawful entry. The People did not file a written opposition.

At the June 9, 2022 preliminary hearing, after the presentation of the evidence, Barry's attorney argued that law enforcement may not create the exigent circumstance it relies on to justify a warrantless search; there were no specific, articulable facts from the investigation showing it was reasonable for the officers to believe exigent circumstances existed; and despite the presence of around 10 law enforcement personnel, no one tried to obtain a warrant before entering Barry's property. The

9

prosecutor argued that in the broader context of the drug-trafficking investigation that began in the parking lot and based on surveillance of the activities and people coming and going from the garage, exigent circumstances existed to detain Barry on his driveway. A protective sweep of the home was justified by information that at least one other person was inside the house with the drugs, with a clear view of the location where the officers detained Barry and Sanchez.

The magistrate denied the suppression motion. The magistrate found Barry's spontaneous statements to the officers were admissible as statements against interest, regardless of whether he was under arrest. All of the drugs and weapons discovered after the search warrant had been issued were "clearly admissible because there was a warrant." The only "real issue" was whether there were exigent circumstances to justify the warrantless entry into Barry's home.[9] The magistrate found exigent circumstances for officer safety were "clearly apparent" because the officers knew at least one person was present in the house, no one answered the door despite movement inside, there was a large amount of drugs to be protected, and there was a reasonable basis for officers to believe there could be weapons. The magistrate concluded, "The officers in my view had every right to go in there to perform at least a protective sweep of the house, and they did that." Further, photographic evidence confirmed the grocery bags full of drugs were clearly visible in plain sight. However, the magistrate found the People did not show the need to preserve evidence created an exigent

---

[9]    The prosecutor did not dispute that the Firmona home was Barry's home despite the absence of any evidence on the issue.

10

circumstance given the sheer size and number of the narcotics involved, stating, "This evidence [is] not going down the toilet. . . ."

The People filed an information on June 22, 2022, and Barry filed a motion in the trial court to set aside the information pursuant to section 995.[10]  Barry asserted substantially the same arguments he raised at the suppression hearing before the magistrate to argue the magistrate's holding order was based on inadmissible evidence.  On September 2 Barry filed a renewed motion to suppress under section 1538.5 in the trial court.  Barry stated in his motion that the court had "indicated" during a hearing that a section 995 motion was not viable without evidence pertaining to the search warrant.[11]  He therefore was renewing his request to suppress all of the evidence presented at the preliminary hearing because it was the fruit of an unlawful search.

On September 12 the People filed a combined opposition to both motions, arguing substantial evidence at the preliminary hearing supported the magistrate's finding the LASD officers were justified in performing a protective sweep of Barry's home and curtilage.  Further, even if evidence found during the protective sweep were suppressed, independent probable cause

---

[10]    As relevant here, section 995, subdivision (a)(2)(B), provides that upon a defendant's motion, a trial court must set aside an information if "the defendant had been committed without reasonable or probable cause."

[11]    The record on appeal does not reflect any proceedings between the June 9, 2022 preliminary hearing and the September 14 hearing on Barry's motions.

11

existed to justify the warrant that led to the discovery of substantially all of the evidence supporting the commitment.

The trial court[12] heard Barry's motions on September 14, 2022. The parties did not present any additional evidence. Observing that Barry was asking to suppress all evidence recovered at the scene, the court found Barry was "attempting to get around a warrant, basically a judge finding that there was probable cause to conduct a search, and you're seeking to ignore it." The court explained the proper procedural mechanism for Barry to obtain relief from the holding order was to bring a motion to quash or traverse the search warrant. Accordingly, the court denied both motions without prejudice, without addressing the parties' substantive arguments and the magistrate's findings.[13]

---

[12] Judge Hector M. Guzman presided over the September 14, 2022 hearing on Barry's renewed motion to suppress and section 995 motion.

[13] The People concede, and we agree, Barry may in this appeal challenge the warrantless entry and search of his property notwithstanding the prosecutor's position in the trial court that there was sufficient information in the warrant independent from the fruits of the warrantless search to provide probable cause for the search and seizure. Further, Barry does not argue on appeal that the trial court erred in denying his motion to suppress based on a procedural determination he was required to bring a motion to quash or traverse the warrant (challenging the sufficiency or veracity of the statements in the search warrant affidavit) before challenging the warrantless search. Barry has therefore forfeited the issue. (See *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 363 ["If a party's briefs do not provide legal argument and citation to authority on each point raised, "'the

C.  *The Plea and Sentence*

On February 28, 2023 Barry entered a no contest plea to possession of a controlled substance while armed with a loaded firearm (Health & Saf. Code, § 11370.1, subd. (a); count 1).  The trial court[14] sentenced Barry to the middle term of three years, suspended execution of the sentence, and placed Barry on formal probation for two years.  The court dismissed the remaining counts.

Barry timely appealed from the judgment.

# DISCUSSION

A.  *Governing Law and Standard of Review*

"Both the federal and state Constitutions prohibit unreasonable searches and seizures.  (U.S. Const., 4th Amend.; Cal. Const., art. I, § 13.)  'In California, issues relating to the suppression of evidence derived from governmental searches and seizures are reviewed under federal constitutional standards.'" (*People v. Ovieda* (2019) 7 Cal.5th 1034, 1041 (*Ovieda*); accord, *People v. Troyer* (2011) 51 Cal.4th 599, 605.)  "'[T]he "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."'" (*Ovieda*, at p. 1041, quoting *Payton v. New York* (1980) 445 U.S. 573, 585.)

"'[I]t is a cardinal principle that "searches conducted outside the judicial process, without prior approval by judge or

---

court may treat it as waived, and pass it without consideration."'"].)

[14]  Judge Kelly Michelle Kelley presided over the plea hearing and sentenced Barry.

13

magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions."'"" (*Ovieda, supra*, 7 Cal.5th at p. 1041; accord, *Robey v. Superior Court* (2013) 56 Cal.4th 1218, 1224; see *People v. Macabeo* (2016) 1 Cal.5th 1206, 1213 ["'In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement.'"].) "The burden is on the People to establish an exception applies." (*Macabeo*, at p. 1213; accord, *Ovieda*, at p. 1041; see *People v. Romeo* (2015) 240 Cal.App.4th 931, 939 (*Romeo*) ["When a defendant raises a challenge to the legality of a warrantless search or seizure, the People are obligated to produce proof sufficient to show, by a preponderance of the evidence, that the search fell within one of the recognized exceptions to the warrant requirement."]; *People v. Pritchett* (2024) 102 Cal.App.5th 355, 360 [same].)

Section 1538.5 provides in relevant part, "A defendant may move . . . to suppress as evidence any tangible or intangible thing obtained as a result of a search or seizure" if the search or seizure "without a warrant was unreasonable." (§ 1538.5, subd. (a)(1)(A).)

A defendant may elect to make a motion to suppress at the preliminary hearing based on the evidence introduced by the People at the hearing. (§ 1538.5, subd. (f)(1).) In such cases, the hearing magistrate "tries the facts, resolving credibility issues and conflicts in the evidence, weighing the evidence, and drawing appropriate inferences." (*Romeo, supra*, 240 Cal.App.4th at p. 941; accord, *People v. Shafrir* (2010) 183 Cal.App.4th 1238, 1244.) If the motion is denied and the defendant is held to answer the charges, the defendant "may either renew the motion before the trial court or file a motion to dismiss under . . .

14

section 995 raising the suppression issue." (*People v. Turner* (2017) 13 Cal.App.5th 397, 404 (*Turner*); accord, *People v. Superior Court (Cooper)* (2003) 114 Cal.App.4th 713, 717; see § 1538.5, subds. (i) & (m).)

"When the defendant files a renewed motion to suppress, the trial court independently reviews the magistrate's legal conclusion and evaluates any new evidence presented, and we review the court's determination." (*Turner*, *supra*, 13 Cal.App.5th at p. 404; see § 1538.5, subd. (i).) "In contrast, when the defendant raises the suppression issue in a . . . section 995 motion, the trial court reviews the magistrate's determination for substantial evidence, and we review the magistrate's determination, not the court's." (*Turner*, at p. 404; see § 1538.5, subd. (m).)

"'The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment.'" (*People v. Redd* (2010) 48 Cal.4th 691, 719; accord, *People v. Felix* (2024) 100 Cal.App.5th 439, 447.) In making this determination, "we do not consider each fact in isolation. Instead, 'we must consider "the totality of the circumstances—the whole picture."'" (*People v. Flores* (2024) 15 Cal.5th 1032, 1043.) "'Our review of issues related to the suppression of evidence seized by the police is governed by federal constitutional standards.'" (*Robey v. Superior Court, supra*, 56 Cal.4th at p. 1223; accord, *People v. Tran* (2019) 42 Cal.App.5th 1, 7.)

15

Because no additional evidence was introduced in the trial court, we review the magistrate's factual findings at the preliminary hearing for substantial evidence. (See *Turner, supra*, 13 Cal.App.5th at p. 404 [where defendant filed a renewed motion to suppress and a section 995 motion, appellate review of the magistrate's findings was "appropriate" because there was no new evidence].) With respect to the trial court's denial of the suppression motion and section 995 motion, we independently determine whether, based on the totality of the circumstances, the warrantless search violated Barry's Fourth Amendment rights. (*People v. Flores, supra*, 15 Cal.5th at p. 1043.)

B.     *Barry Forfeited His Contention the Use of Night-vision Binoculars Constituted an Illegal Search*

For the first time on appeal, Barry contends Detective Yoshida's use of night-vision binoculars to surveil Barry's activities in his garage constituted an illegal search in violation of Barry's Fourth Amendment rights. Barry forfeited this contention by failing to object to the surveillance at the preliminary hearing or in the trial court.

To claim Fourth Amendment protection against a warrantless search, "'a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable.'" (*People v. Jenkins* (2000) 22 Cal.4th 900, 972; accord, *People v. Cartwright* (2024) 99 Cal.App.5th 98, 102.) Construing decisions of the United States Supreme Court, California appellate courts have held that enhanced surveillance methods may in some circumstances violate a defendant's reasonable expectation of privacy. (See, e.g., *People v. Arno* (1979) 90 Cal.App.3d 505, 511-512 [use of high-

16

power binoculars from a hilltop several hundred feet away to view the inside of a seventh-floor office was an illegal search]; cf. *People v. Lieng* (2010) 190 Cal.App.4th 1213, 1221, 1228 [use of night vision goggles to surveil defendant's shed and garage from the end of a 50 yard driveway did not invade a reasonable expectation of privacy].)

These decisions hinge on a fact-specific consideration of the visibility of the defendant's activities without enhancement, the logistics of the police surveillance, and the technology involved, which together inform the defendant's reasonable expectation of privacy. (See *Arno*, *supra*, 90 Cal.App.3d at p. 509 ["if the purpose of the optically aided view is to permit clandestine police surveillance of that which could be seen from a more obvious vantage point without the optical aid, there is no unconstitutional intrusion; [but] . . . if the purpose of the optical aid is to view that which could not be seen without it, there is"]; *Lieng*, *supra*, 190 Cal.App.4th at pp. 1227-1228 [night-vision goggles used were "available to the general public" and "merely amplif[ied] ambient light to enable one to see something that is already exposed to public view"].)

"'[W]hen defendants move to suppress evidence under section 1538.5, they must inform the prosecution and the court of the specific basis for their motion.'" (*People v. Silveria and Travis* (2020) 10 Cal.5th 195, 235; accord, *People v. Williams* (1999) 20 Cal.4th 119, 129.) "'[T]he scope of issues upon review must be limited to those raised during argument . . . . This is an elemental matter of fairness in giving each of the parties an opportunity adequately to litigate the facts and inferences relating to the adverse party's contentions.'" (*Williams*, at p. 136; accord, *People v. Manning* (1973) 33 Cal.App.3d 586, 601.) "The

17

determinative inquiry in all cases is whether the party opposing the motion had fair notice of the moving party's argument and fair opportunity to present responsive evidence." (*Williams*, at p. 136.) "Defendants cannot . . . lay a trap for the prosecution by remaining completely silent until the appeal about issues the prosecution may have overlooked." (*Id*. at p. 131.)

Barry's motion to suppress, his subsequent motions, and his attorney's argument at the initial suppression hearing were limited to the police entry onto his driveway and search of his home. Barry never argued that Detective Yoshida's use of night-vision binoculars to surveil the garage invaded Barry's privacy expectations or generally that the surveillance was a basis to suppress the evidence. On direct examination, Detective Yoshida testified he had a "direct line of sight" down Barry's driveway and into the garage, and from his vantage point 60 feet away he could "see" Barry dismantling the bumper and unloading the narcotics packages. During cross-examination, Barry's attorney asked whether Detective Yoshida used binoculars and night vision, which the detective answered in the affirmative, but the attorney did not follow up with questions probing, for example, what the detective could see unaided or what was visible from a closer but more conspicuous vantage point. (*People v. Arno, supra*, 90 Cal.App.3d at p. 509.) The attorney's question, absent any follow up or argument about the surveillance, did not afford the prosecutor a fair opportunity to present responsive evidence and to litigate the facts and inferences relating to the surveillance. Accordingly, Barry has forfeited the issue. (*People v. Williams, supra*, 20 Cal.4th at p. 130 [holding "if defendants detect a critical gap in the prosecution's proof or a flaw in its legal analysis, they must object on that basis to admission of the

18

evidence or risk forfeiting the issue on appeal," but concluding defendant had sufficiently raised the issue in his written motion].)

C.  *Exigent Circumstances Justified the Officers' Entry onto Barry's Driveway To Arrest Him*

Barry contends the Cal-MMET team violated his Fourth Amendment rights when officers swarmed onto his driveway and arrested him without a warrant.[15]  He argues the officers had ample time to obtain a warrant while surveilling him and could have waited until he left his property to arrest him.  Further, he asserts, exigent circumstances did not support the warrantless intrusion into the curtilage of his home.[16]  Substantial evidence supported a finding of exigent circumstances to arrest Barry on his driveway.

---

[15]  In his suppression motion Barry asserted the officers detained him on his driveway (after handcuffing him) and confined him in a squad car for several hours before formally arresting him.  He argued, and the magistrate found, the initial detention constituted an arrest.  The People do not dispute the finding, and we assume for purposes of our analysis that Barry was under arrest.

[16]  "'[C]urtilage'" refers to the "area immediately surrounding and associated with the home" and is "entitled to the same degree of privacy protection as the home."  (*People v. Nunes* (2021) 64 Cal.App.5th 1, 5-6.)  Warrantless searches and seizures within a home's curtilage "are presumptively unreasonable."  (*Murchison v. County of Tehama* (2021) 69 Cal.App.5th 867, 883.)  We assume without deciding the location where Barry was arrested—"no more than 10 feet" from his house—was within the curtilage of his home.

"'[W]arrentless arrests within the home are proscribed unless exigent circumstances exist.'" (*People v. Lujano* (2014) 229 Cal.App.4th 175, 182; accord, *People v. Ramey* (1976) 16 Cal.3d 263, 276 ["warrantless arrests within the home are per se unreasonable in the absence of exigent circumstances"].) "The term 'exigent circumstances' describes ""an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence."""" (*Ovieda, supra,* 7 Cal.5th at p. 1041; accord, *People v. Suarez* (2020) 10 Cal.5th 116, 151.)

Factors relevant to a court's determination whether exigent circumstances exist include, among others, "the gravity of the offense involved; whether the subject of the arrest is reasonably believed to be armed; whether probable cause is clear; whether the suspect is likely to be found on the premises entered; and the likelihood that the suspect will escape if not promptly arrested." (*People v. Bacigalupo* (1991) 1 Cal.4th 103, 122, judg. vacated and cause remanded on other grounds sub nom. *Bacigalupo v. California* (1992) 506 U.S 802.) Even so, """"[t]here is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers."""" (*People v. Troyer, supra*, 51 Cal.4th at p. 606.) """"[T]he reasonableness of an officer's conduct is dependent upon the existence of facts available to him at the moment of the search or seizure which would warrant a [person] of reasonable caution in the belief that the action taken was appropriate. [Citation.] And in determining whether the officer acted reasonably, due weight must be given not to his unparticularized suspicions or 'hunches,' but to the reasonable inferences which he is entitled to draw from

the facts in the light of his experience."'" (*Ovieda, supra*, 7 Cal.5th at p. 1043.)

At the preliminary hearing, the prosecutor presented substantial evidence to support a finding of exigent circumstances.[17] Barry came under the scrutiny of the Cal-MMET team because he entered the white sedan that was already under surveillance in connection with a vehicle-swap drug-trafficking operation, and he drove it to his home. During Detective Yoshida's surveillance of the Firmona home, he observed Barry disassembling the vehicle's bumper and removing large "kilo-sized" bricks of narcotics, then Gabriela shuttling between Barry's position and the direction of the house, and finally Barry carrying a grocery bag of narcotics into the house. Further, the detectives reasonably believed that at least two other individuals were involved in the operation (Gabriela and Sanchez). The detectives also reasonably believed the suspects were armed, given the large-scale narcotics operation. (See *People v. Glaser* (1995) 11 Cal.4th 354, 368 [courts "recognize[] [the] propensity of persons "engaged in selling narcotics [to]

_____

[17] As discussed, we accept the magistrate's express and implied factual findings provided they are supported by substantial evidence. (*People v. Redd, supra*, 48 Cal.4th at p. 719.) At the preliminary hearing, the magistrate did not separately address Barry's arrest on his driveway. However, Barry argued the officers did not obtain a warrant before entering Barry's property (including his driveway), and the prosecutor responded that there were exigent circumstances to detain Barry on his driveway. We therefore imply a factual finding by the magistrate, in denying the motion to suppress, that there were exigent circumstances to support entry onto the driveway.

21

frequently carry firearms to protect themselves from would-be robbers"""]; *People v. Ledesma* (2003) 106 Cal.App.4th 857, 865 (*Ledesma*) ["it was reasonable to conclude that the residence was the site of ongoing narcotics activity [and] [f]irearms are, of course, one of the "'tools of the trade'" of the narcotics business"].) In addition, Detective Yoshida testified the decision to arrest Barry on the driveway was made immediately after the detective reported to the team that Barry and Sanchez were about to drive off the property; Detective Magdaleno explained immediate action was necessary for the team to stop Barry from departing in the vehicle and potentially eluding detectives while they secured the Firmona home.

On appeal Barry contends there was no exigency when the officers decided to enter his driveway because they "believed the movement of contraband was complete based upon their explanation of how they believed the narcotics operation worked," and therefore they could have waited for a warrant before entering the property. Conversely, Barry argues, "if officers believed the contraband was being relocated, that negates the need to search Barry's property," and they could have arrested Barry off-site. But there was substantial evidence officers reasonably believed narcotics were located in the home *and* in the departing vehicle: Detective Yoshida observed several bricks being taken toward the house, and Detective Magdaleno testified based on his experience with vehicle swaps and Barry's conduct that additional narcotics were likely concealed in the vehicle. Detective Magdaleno testified it would have been impossible with the available officers (about 10) for the team, while waiting for the detectives to obtain a search warrant, to safely tail Barry and Sanchez after they drove off the property without losing them,

22

and at the same time secure the house where the drugs and at least one other accomplice were present.

D.     *Officer Safety Justified Entry into the Firmona Home and the Protective Sweep*

Barry also contends the officers violated his Fourth Amendment rights when they forcibly entered and searched his house without a warrant.  Substantial evidence supports the magistrate's finding that the circumstances of Barry's arrest posed a threat to officer safety, justifying entry into the house to perform a protective sweep.

"One recognized exigent circumstance that will support the warrantless entry of a home—the risk of danger to police or others on the scene—also provides the justification for a 'protective sweep' of a residence."  (*People v. Celis* (2004) 33 Cal.4th 667, 676-677, citing *Maryland v. Buie* (1990) 494 U.S. 325.)  As the court explained in *Celis* at page 680, "the United States Supreme Court has articulated certain legal rules, allowing, for instance, a warrantless entry into a home when exigent circumstances exist, or permitting a protective sweep of areas of a home where persons in hiding may pose a danger to officer safety."  A protective sweep "aimed at protecting the arresting officers" is "not a full search of the premises" and "may extend only to a cursory inspection of those spaces where a person may be found."  (*Buie*, at p. 335.)  A protective sweep "can be justified by a standard lower than probable cause, namely, reasonable suspicion."  (*Celis*, at p. 680.)  Under this standard, officers need only "'articulable facts' considered together with the rational inferences drawn from those facts, that would warrant a reasonably prudent officer to entertain a reasonable suspicion

23

that the area to be swept harbors a person posing a danger to officer safety." (*Id.* at pp. 679-680; cf. *id.* at p. 677 ["'a mere "inchoate and unparticularized suspicion or 'hunch'"'" is insufficient].) "[I]n determining the existence of reasonable suspicion, courts must evaluate the "'totality of the circumstances'" on a case-by-case basis to see whether the officer has "'a particularized and objective basis'" for his or her suspicion." (*Ledesma, supra*, 106 Cal.App.4th at p. 863, quoting *United States v. Arvizu* (2002) 534 U.S. 266, 273.)

The totality of circumstances supports the magistrate's finding that exigent circumstances were "clearly apparent" based on a threat to officer safety, which gave the officers the right to enter the house and perform a protective sweep. Detective Yoshida saw Barry carry a bag containing several "kilo-sized" bricks of narcotics into the house, and he reasonably believed Gabriela was involved in the drug operation and was inside the house. Barry confirmed this while the officers detained him. The location where six of the 10 officers stopped Barry and Sanchez was "directly in line" with and "no more than 10 feet" from the house, and several windows faced onto the driveway. Detective Magdaleno testified that in a large-scale narcotics operation such as this one, "we're fearful of individuals inside locations who could be arming themselves, or people that we have . . . not been able to detain at that point." As discussed, courts have held this fear is reasonable in drug operations. (See *People v. Glaser, supra*, 11 Cal.4th at pp. 367-368; *People v. Ledesma, supra*, 106 Cal.App.4th at p. 865.) The officers therefore reasonably conducted a protective sweep of the driveway, garage, and backyard, until they reached the rear door of the house.

24

Detective Magdaleno then banged on the door, announced it was the Sheriff's Department, and asked (in English and Spanish) the occupant to come to the door.  Although Detective Magdaleno could hear footsteps and shuffling inside the house, no one responded to his announcement and the banging on the door, renewing his fear that individuals inside were "possibly . . . arming themselves."[18]  After waiting for a minute, officers began to breach the door.  When Gabriela finally emerged, they held her outside while they conducted a protective sweep of the hallway, common areas, and the rooms looking out onto the driveway.[19]

Barry argues that forced entry into his house cannot be justified by an officer-safety exigency because the officers created the exigency when they illegally entered his driveway to arrest him in view of the house.  Barry cites *Kentucky v. King* (2011) 563 U.S. 452, 470 (*King*), in which the United States Supreme Court delineated the scope of the "police-created exigency doctrine."  The court rejected the Kentucky Supreme Court's broad and subjective interpretation of the doctrine as applying in cases where officers either "'deliberately created the exigent circumstances with [] bad faith'" or "'"it was reasonably foreseeable that the investigative tactics employed by the police

---

[18]    In his opening brief Barry asserts (without any citation to the record) that Gabriela was in the shower when she heard shouting at the back door, and she answered the door wet and "[c]ompletely nude" because she did not have a towel nearby.  No evidence was presented at the preliminary hearing to support these assertions.

[19]    Barry does not dispute that the grocery bags of narcotics were in plain view in the hallway and the other evidence seized from the home was later found pursuant to a search warrant.

25

would create the exigent circumstances.""" (*Id*. at pp. 464-466.) Instead, the United States Supreme Court announced a narrower, objective standard, holding that law enforcement cannot rely on exigent circumstances to justify a warrantless search or seizure where officers first "gain[ed] entry to premises by means of an actual or threatened violation of the Fourth Amendment." (*Id*. at pp. 469.)

Here, Barry points to Detective Magdaleno's admission during cross-examination that it would be fair to say his team members "created [the] exigency" to enter the house "by making [themselves] known to the people at the residence" when they arrested Barry and Sanchez on the driveway. But even if we accept Detective Magdaleno's conclusory response as evidence, this does not establish a "police-created exigency" under *King*. As discussed, the officers' entry onto Barry's driveway to arrest him did not violate his Fourth Amendment rights. Thus, even if the officers' actions created an officer-safety exigency by exposing officers to armed individuals inside the house—and even if it was foreseeable that arresting Barry on his driveway could create this danger—the police-created exigency doctrine does not apply. (See *King, supra*, 563 U.S. at pp. 471-472 [where police announced themselves and banged on the door of a suspected drug dealer's apartment but did not "'demand'" entry, there was no Fourth Amendment violation or threatened violation; therefore, the officers' subsequent decision to break down door after they heard activity inside was justified by the exigent circumstance of evidence preservation].)

## DISPOSITION

The judgment is affirmed.

FEUER, J.

We concur:

SEGAL, Acting P. J.

PULOS, J.*

---

\* Judge of the San Diego County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

27